UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

ROBERT BIGGER,

                    Plaintiff,                                  Case No. 1:24-cv-10841

v.                                        Honorable Thomas L. Ludington
                                                 United States District Judge

KYLE GRUBBS, et al.,

                    Defendants.

_____/

## OPINION AND ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND DISMISSING PLAINTIFF'S COMPLAINT

This case arises from a December 4, 2023, roadside encounter that escalated into an arrest and use of force by Michigan State Police troopers. Based on that encounter, Plaintiff Robert Bigger sued two of the troopers, Defendants Kyle Grubbs and Justin Henderson. He alleges that they violated the Fourth Amendment by employing excessive force during that arrest—specifically, a leg-sweep takedown and two drive-stun deployments of a taser.

On July 3, 2025, Defendants moved for summary judgment. They contend that they are entitled to qualified immunity. This Court agrees. As a result, their Motion for Summary Judgment will be granted, and Plaintiff's Complaint will be dismissed with prejudice.

## I.

### A. Factual Background

On December 4, 2023, Plaintiff Robert Bigger's friend, Maribel Anaya, lost control of a car that he had given her, rolling it over and crashing it into a ditch. ECF Nos. 50-4 at PageID.734; 50-7 at PageID.812. After crashing, Ms. Anaya phoned Tanya Bigger, Plaintiff's wife, who was at home nearby. ECF No. 50-4 at PageID.735. Mrs. Bigger then called Plaintiff, who was hunting

not far from the scene, and they then drove separately to the crash site. *Id.* at PageID.734; ECF No. 50-2 at PageID.703.

Shortly before the Biggers arrived, two Michigan State Police (MSP) units responded to the accident. *See* ECF Nos. 50-7 at PageID.812; 50-4 at PageID.735. The first MSP unit consisted of Trooper Tanner Harrison and Defendant Justin Henderson; the second, Trooper Jonathan McGinn and Defendant Kyle Grubbs. *See* ECF No. 50-9 at PageID.872. After the Troopers secured the scene, Trooper Harrison issued Ms. Anaya a citation for the crash. ECF Nos. 50-4 at PageID.736; 50-9 at PageID.869.

Plaintiff took issue with the citation. When he learned about it after helping the responding tow-truck driver secure car debris from the crash, he decided to question the Troopers. *See* ECF Nos. 50-4 at PageID.736; 50-9 at PageID.869. The Troopers' dash and body cameras captured the discussion and the events that followed.

Plaintiff began by approaching Trooper Harrison and Defendant Henderson's vehicle.[1] ECF No. 50-9 at PageID.871. After Trooper Harrison rolled down the window, Plaintiff leaned partly into the patrol vehicle on the windowsill and started explaining his position. ECF No. 45-2 at 0:00–08. Defendant Henderson asked Plaintiff to return to his car. ECF No. 45-5 at 0:06–07. In response, Plaintiff declared, "It's America, I'll be where I want to be." *Id.* at 0:09. Defendant Henderson stated that the Troopers would exit their vehicle to discuss the issue. *Id.* at 0:12–19.

Once Defendant Henderson and Trooper Harrison stepped outside the vehicle, Plaintiff continued questioning the Troopers about Ms. Anaya's citation. *Id.* at 0:19–31. Defendant

---

[1] For context, at the time, the Troopers thought that Plaintiff was a volunteer firefighter who responded to the scene, as is common practice in that area. *See* ECF Nos. 50-9 at PageID.871; 50-7 at PageID.812.

Henderson told Plaintiff that he would not explain Ms. Anaya's citation further. ECF No. 45-2 at 0:31–33. Still, Plaintiff pushed his position. *Id.* at 0:33–44. Defendant Henderson reiterated that he would not explain further and directed Plaintiff to return to his vehicle. *Id.* at 0:44–50. Undeterred, Plaintiff continued to debate with Defendant Henderson. *Id.* at 0:50–57.

At that point, Defendant Grubbs had exited his cruiser and approached the developing confrontation with Plaintiff, with Trooper McGinn not far behind. *See id.* With Defendant Grubbs now next to him, Defendant Henderson asked Plaintiff, "Why are you so mad right now?" *Id.* at 0:56–58. Plaintiff asked Defendant Henderson, "Why would you write the lady a ticket?" *Id.* at 0:58–1:00. Defendants Grubbs and Henderson both explained that the ticket was due to the crash. *Id.* at 1:00–02. Plaintiff then pressed the Troopers with more questions about their ticketing practices. *Id.* at 1:02–06.

Eventually, Defendant Grubbs instructed Plaintiff to return to his vehicle. *Id.* at 1:06–08. Plaintiff replied that he was on public land, prompting the Troopers to remind Plaintiff that he was at a crash scene. *Id.* at 1:08–13. Rather than returning to his vehicle, Plaintiff walked to a nearby wood line. *Id.* at 1:13–16. After that, he informed the Troopers where he had parked his truck and that he now stood in the "Huron National Forrest." *Id.* at 1:16–20.

The Troopers then approached Plaintiff at the wood line. *Id.* at 1:20–23. Visibly agitated, Plaintiff remained confrontational with the Troopers about the situation and Anaya's ticket. *Id.* at 1:23–49. Defendant Grubbs inquired into Plaintiff's relationship with Ms. Anaya, clarifying that if Plaintiff had "zero relationship" with her, he needed to leave. *Id.* at 1:50–56. Plaintiff continued quarreling, so Defendant Grubbs notified Plaintiff that he needed to go to his truck, or the Troopers would take him there. *Id.* at 1:56–2:12.

Plaintiff did not comply. Instead, Plaintiff stated that he "would like to get answers." *Id.* at 2:15–16. Defendant Grubbs then expressed that "You don't need any answers; you don't get answers; you have no right here." ECF No. 45-6 at 1:35–38. Plaintiff responded, "And who are you?" ECF No. 45-2 at 2:20–21. In response, Defendant Grubbs exclaimed, "I'm Trooper Grubbs with the Michigan State Police; I belong here, you don't!" *Id.* at 2:21–24. Defendant Grubbs also ordered Plaintiff back to his car—this time warning Plaintiff that if he did not comply, the Troopers would arrest him for resisting and obstructing. *Id.* at 2:24–33. Yet Plaintiff persisted, asserting that "obstructing is a physical act." *Id.* at 2:33–35. Following that assertion, the Troopers again reminded Plaintiff that he was at an automobile crash scene and again directed him to return to his car. *Id.* at 2:35–43. Plaintiff yelled, "Which one? I got three here!" *Id.* at 2:43–45.

At that point, Plaintiff's wife called for him, and Plaintiff instructed her to return to her car. *Id.* at 2:45–47. She approached Plaintiff and insisted that they leave. *Id.* at 2:47–51. That time, Plaintiff began walking away. *Id.* at 2:51–53. But Plaintiff walked in the opposite direction from where he had earlier told the Troopers that he had parked his truck. *Compare id. with id.* at 1:16–20. So Defendant Grubbs asked Plaintiff whether his "car [was] that way," as he pointed in the direction Plaintiff had earlier told the Troopers that he parked. *Id.* at 2:54–55. Defendant Grubbs then told Mrs. Bigger, "You better get him back to his car because if he--." *Id.* at 2:55–57.

Things escalated. Before Defendant Grubbs could complete his sentence, Plaintiff executed an abrupt about-face and shouted, "She better not do nothing, first of all!" *Id.* at 2:57–3:00. At the same time, "while clearly agitated," as Plaintiff himself states, ECF No. 50 at PageID.658, he marched toward his wife and the Troopers, ECF No. 45-2 at 2:57–3:00. In turn, Defendant Grubbs walked toward Plaintiff and informed him that he was under arrest. ECF No. 45-6 at 2:17–19. As Defendant Grubbs grabbed Plaintiff's arms to handcuff him, Plaintiff tensed and flexed his arms,

jerking them up and away while Defendant Grubbs had a hold of them. ECF Nos. 45-2 at 3:00–02; 45-5 at 2:59–3:01. After Plaintiff jerked his arms away, Defendant Grubbs put his leg in front of Plaintiff's and executed a leg sweep, controlling Plaintiff to the ground. ECF No. 45-2 at 3:02–04.

The takedown did not end things. Once on the ground, all four Troopers worked to subdue Plaintiff.  ECF No. 45-4 at 2:53–3:43. Various body and dash cameras depict Plaintiff physically struggling with the Troopers by, for example, pulling his legs away from the Troopers attempting to restrain them. *E.g.*, ECF Nos. 45-2 at 3:04–09; 45-4 at 2:53–57; 45-7 at 2:23–26; *accord* ECF No. 50-9 at PageID.873 (describing the struggle as Plaintiff "put[ting] his knees underneath him and then bring[ing] his arms up" until the Troopers could "pull his legs out"). Then, the Troopers repeatedly ordered Plaintiff to place his hands behind his back. *See, e.g.*, ECF No. 45-5 at 3:09–30. He did not do so and, at times, tucked his hands under his body. *See* ECF Nos. 50-9 at PageID.873–75; 45-11 at PageID.513–14, 574; *accord* ECF No. 50-4 at PageID.737–38 (confirming that Plaintiff did not place his arms behind his back, albeit stating that he could not do so due to preexisting injuries).

Ultimately, Defendant Grubbs resorted to drawing his taser. *See* ECF No. 45-2 at 3:25–34. At about the same time, another Trooper was able to work Plaintiff's right arm behind his back, but not the left arm. ECF No. 45-5 at 3:30–34. Right after, Defendant Grubbs deployed his taser in drive-stun mode[2] for two, back-to-back, five-second cycles to yield compliance. *Id.* at 3:34; *see*

---

[2] Generally, tasers have two modes with materially different effects. *Cockrell v. City of Cincinnati*, 468 F. App'x 491, 492 (6th Cir. 2012). In dart, or probe, mode, the device fires barbed probes into the subject and delivers a high-voltage electrical charge that overrides the central nervous system to instantly cause full-body muscular paralysis and intense, radiating pain and leave the person limp. *Id.* By contrast, in drive-stun mode—used here—the officer presses the electrodes directly against the body, producing a localized electric shock that does not incapacitate the entire body or

*also* ECF Nos. 45-11 at PageID.506–07, 574, 582; 45-12 at PageID.628. While he was being tased, Plaintiff started expressing that he was not resisting. *See* ECF Nos. 45-5 at 3:36–39. At the same time, Plaintiff's still-free left hand—which was clenched in a fist at his waistband—relaxed, and one of the Troopers secured it behind Plaintiff's back. ECF Nos. 45-5 at 3:36–39; 45-2 at 3:35–39. Defendant Grubbs did not tase him again after that.

Once both Plaintiff's hands were behind his back, his wife notified the Troopers that Plaintiff "has bad shoulders." ECF No. 45-2 at 3:42–44. Plaintiff then echoed her statement, confirming that he had injured shoulders, after which his wife explained that he could not put his hands all the way behind his back. *Id.* at 3:49–55. As a result, to "alleviate[] the tension" on Plaintiff's shoulders, the Troopers used two sets of handcuffs to handcuff him. ECF No. 45-11 at PageID.587; *see also* ECF No. 45-2 at 3:55–4:35.

After handcuffing Plaintiff, the Troopers guided him to his feet. *Id.* at 5:01–07. They then removed all items from Plaintiff's pockets and placed Plaintiff in Defendant Henderson's vehicle. *Id.* at 5:10–8:39. Later, the Troopers took him to Iosco County Jail for confinement. ECF No. 50-7 at PageID.812.

Two days after his arrest, the county prosecutor charged Plaintiff with (1) resisting and obstructing a police officer under MICH. COMP. LAWS § 750.81d(1), and (2) disturbing the peace under MICH. COMP. LAWS § 750.170. ECF No. 11-2 at PageID.82. On January 9, 2024, Plaintiff pleaded guilty to disturbing the peace in exchange for dismissal of the resisting-and-obstructing

---

override the nervous system. *Id.* Because dart mode seizes control of the body as a whole rather than inducing localized pain alone, it is the more severe and intrusive use of force. *Id.*

charge. ECF No. 45-9 at PageID.467. The resisting-and-obstructing charge was dismissed later that day. ECF No. 45-10 at PageID.477.

### B. Procedural Background

On April 2, 2024, Plaintiff sued Defendants Grubbs and Henderson, alleging that they violated the Fourth Amendment by using excessive force during his arrest. ECF No. 1 at PageID.4–5. Plaintiff later moved to amend his Complaint to add new claims and two new defendants, Troopers McGinn and Harrison. ECF No. 9. But that motion was denied because Plaintiff knew—or should have known—that those two Troopers were present at the scene as early as December 2023, demonstrating undue delay or bad faith in his effort to join them and add claims. ECF No. 22. Defendants then sought summary judgment on July 3, 2025. ECF No. 45.

### II.

Summary judgment is proper when no genuine dispute of material fact exists, and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A material fact is one that "affect[s] the outcome of the suit under the governing law." *DeVooght v. City of Warren*, 157 F.4th 893, 899 (6th Cir. 2025) (citation modified). And a genuine dispute is a dispute that, based on the evidence presented, would allow a reasonable trier of fact "to rule in favor of the nonmoving party." *Id.* Thus, "[p]utting all of that together, Rule 56 asks whether the evidence is so one-sided that one party must prevail as a matter of law." *Id.* (citation modified).

When seeking summary judgment, the movant must identify parts of the record showing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to the nonmovant to "present significant probative evidence that will reveal that there is more than some metaphysical doubt as to the material facts." *Miller v. Maddox*, 866 F.3d 386, 389 (6th Cir. 2017) (citation modified). The mere existence of a scintilla of evidence

supporting the nonmovant's position will not suffice to avoid summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

At this stage of the case, courts are not to weigh the evidence presented. *Id.* at 249. Nor can courts assess the competency and credibility of witnesses. *Id.* at 255. Further, courts must draw all reasonable inferences in favor of the nonmovant. *Finley v. Huss*, 102 F.4th 789, 804 (6th Cir. 2024). But where, as here, a video captures the underlying events, this "claimant-friendly standard . . . does not close [courts'] eyes" to the realities of such evidence. *Moore v. Oakland Cnty.*, 126 F.4th 1163, 1167 (6th Cir. 2025). Rather, courts are "free to assess" video evidence "'in the light depicted by the videotapes.'" *Id.* (quoting *Scott*, 550 U.S. at 381). And courts need not accept facts blatantly contradicted by the record. *DeVooght*, 157 F.4th at 899–900.

### III.

### A. Qualified Immunity Framework

Defendants' argument for summary judgment is based on a familiar, two-fold qualified immunity defense. First, they contend they did not violate Plaintiff's constitutional rights when arresting him. ECF No. 45 at PageID.407–16. Second, they argue that even if they did violate his constitutional rights, that violation did not flout clearly established law, entitling them to qualified immunity. *Id.* at PageID.417–18.

Where applicable, qualified immunity protects government officials from civil liability. *Vanderhoef v. Dixon*, 938 F.3d 271, 276 (6th Cir. 2019). It applies to Plaintiff's § 1983 claim against Troopers Henderson and Grubbs unless their conduct violated Plaintiff's clearly established constitutional rights. *Finley*, 102 F.4th at 804 (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). This standard implicates two questions: (1) Did Defendants Henderson and Grubbs's conduct violate Plaintiff's constitutional rights? (2) If so, was that violation clearly established on

December 4, 2023? *See Ortega v. U.S. Immigr. & Customs Enf't*, 737 F.3d 435, 438 (6th Cir. 2013). This Court can address these questions in any order, and "if the answer to either question is 'no,'" then Defendants Henderson and Grubbs are "entitled to qualified immunity." *Finley*, 102 F.4th at 804–05. When filtered through these questions, Plaintiff's Fourth Amendment claim against Defendants Henderson and Grubbs does not survive summary judgment.

### B. Plaintiff's Fourth Amendment Claim

Plaintiff brings a single constitutional claim against Defendants: A Fourth Amendment excessive force claim. ECF No. 1 at PageID.4–5. The Fourth Amendment protects people from "unreasonable searches and seizures." *Vanderhoef*, 938 F.3d at 276 (citing U.S. Const. amend. IV). An officer's use of excessive force constitutes an unreasonable seizure that violates the Fourth Amendment. *Id.* When assessing constitutional claims under § 1983 like Plaintiff's here, where "more than one officer is involved, the court must consider each officer's" constitutional liability and "qualified immunity [defense] separately." *Wright v. City of Euclid*, 962 F.3d 852, 865 (6th Cir. 2020).

Plaintiff's excessive force claim rests on two theories. Plaintiff's first theory of excessive force is that using a leg-sweep on him violated his clearly established Fourth Amendment rights; his second is that using a taser on him likewise violated his clearly established Fourth Amendment rights. ECF No. 1 at PageID.5; *see also* ECF No. 50 at PageID.645. These theories are addressed below. Neither passes muster against either Defendant.

### 1. Defendant Grubbs

Begin with Defendant Grubbs's liability. For the reasons explained below, he is entitled to qualified immunity.

### a. Constitutional Analysis

Fourth Amendment jurisprudence "has long recognized that the right to make an arrest . . . necessarily carries with it the right to use some degree of physical" force "to effect it." *Graham v. Connor*, 490 U.S. 386, 396 (1989). To determine whether an officer's degree of force was excessive, courts ask whether the force used was objectively reasonable. *VanPelt v. City of Detroit*, 70 F.4th 338, 340 (6th Cir. 2023). In so doing, courts must not apply the "20/20 vision of hindsight" from the "comfort of their chambers." *Id.* (cleaned up). Not "every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers," violates the Fourth Amendment. *Graham*, 490 U.S. at 396. Courts must instead consider the perspective of a reasonable officer on the scene, understanding that "officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary." *Id.* at 396–97.

Adopting that perspective, courts must analyze "whether the totality of the circumstances justifies a particular level of force." *Coffey v. Carroll*, 933 F.3d 577, 588 (6th Cir. 2019). Three factors guide this analysis: (1) the severity of the crime at issue, (2) the immediacy of the threat the suspect posed to the safety of the officer or others, if any, and (3) the suspect's active resistance or evasion, if any. *Wright*, 962 F.3d at 865. But at day's end, the analysis is "context-sensitive," and courts "must consider all the relevant circumstances" known to the officers when they used force. *Barnes v. Felix*, 605 U.S. 73, 76 (2025). Put differently, an officer's use of force "cannot be hermetically sealed off from the context in which [it] arose." *Id.* at 80 (citation modified). Rather, courts must evaluate the "events preceding the use of force occurring in close temporal proximity," while "excluding distinct events that played no direct or foreseeable role in a particular use of

force." *Feagin v. Mansfield Police Department*, 155 F.4th 595, 610 (6th Cir. 2025) (citation modified).

Mindful of this context-driven directive, turn to the third guiding factor—the degree of Plaintiff's resistance or evasion. Most excessive force cases "rise and fall with" this factor. *Shanaberg v. Licking Cnty.*, 936 F.3d 453, 456 (6th Cir. 2019). This case is no different. So this Court needs only to address the degree of Plaintiff's resistance to resolve the constitutional question. *See Rudlaff v. Gillispie*, 791 F.3d 638, 641–42 (6th Cir. 2015) (assessing only the third factor to resolve the constitutional question).

The Sixth Circuit distinguishes between two categories of resistance: passive and active. *See Goodwin v. City of Painesville*, 781 F.3d 314, 323 (6th Cir. 2015). This distinction matters. Indeed, the category of resistance affects the degree of force an officer may use to arrest someone. *See Chaney-Snell v. Young*, 98 F.4th 699, 717–18 (6th Cir. 2024) (concluding that dating back to the English common-law, the permissible degree of force an officer could use to effectuate an arrest largely depended on the degree of resistance from an arrestee) (collecting sources). Defining what constitutes active and passive resistance is thus critical.

Start with passive resistance. People passively resist when, without using "overtly threatening language," they are *verbally* uncooperative, insulting, or argumentative. *Shumate*, 44 F.4th at 447–48; *see also Goodwin*, 781 F.3d at 323–24. In other words, passive resistance "entails a lack of physical *resistance*," flight, or verbal threats. *King v. City of Rockford*, 97 F.4th 379, 396 (6th Cir. 2024) (citation modified) (emphasis added). As a result, mere noncompliance constitutes passive resistance. *Saalim v. Walmart, Inc.*, 97 F.4th 995, 1005 (6th Cir. 2024). In that same vein, failure to present one's hands for handcuffing, without other indicia of defiance, is passive resistance, not a "deliberate act of defiance using one's own body." *Jackson-Gibson v. Beasley*,

- 11 -

118 F.4th 848, 856–57 (6th Cir. 2024) (citation modified). And a suspect's slight physical movement during an arrest can also constitute passive resistance—so long as that movement does not reflect a volitional act of defiance when knowingly facing arrest. *See, e.g.*, *Saalim*, 97 F.4th at 1006–08; *Wright*, 962 F.3d at 867. Sixth Circuit cases make the scope of passive resistance more concrete.

Take some straightforward cases where the plaintiff was merely noncompliant, verbally confrontational, or both. One such case is *Kent v. Oakland County*, 810 F.3d 384 (6th Cir. 2016). In *Kent*, the plaintiff continually yelled at emergency responders who responded to his father's death and sought to resuscitate him despite the plaintiff's contrary directives. *Id.* at 387–88. When officers later arrived, the plaintiff spurned several of their commands, including orders to calm down, lower his hands, and leave the room. *Id.* Finally, facing persistent noncompliance and verbal conflict from the plaintiff, an officer tased him in dart mode and handcuffed him. *Id.* at 388–89. *Kent* held that the plaintiff's conduct established passive resistance because he only refused to comply with commands and, at most, was impolite, not verbally threatening. *Id.* at 392–94.

Another such case is *Goodwin v. City of Painesville*, 781 F.3d 314 (6th Cir. 2015), which resembles *Kent*. In *Goodwin*, officers responded to a noise complaint at the plaintiff's apartment. *Id.* at 318. After some discussion with the plaintiff, the officers left his apartment but remained at the complex. *Id.* at 318–19. Eventually, the officers heard additional loud noises coming from the plaintiff's apartment and returned to it. *Id.* at 319. When the plaintiff answered the door, the officers ordered him to step outside. *Id.* The plaintiff refused and shut the door on the officers, so the officers kicked in the door and, without warning, tased the plaintiff in dart mode for an unusually long time. *Id.* As the plaintiff convulsed due to the dart-mode tasing, the officers ordered him to

- 12 -

place his hands behind his back. *Id.* at 324. The plaintiff did not present his hands, so the officers tased him a second time in drive-stun mode. *Id.*

*Goodwin* deemed the plaintiff's conduct passive resistance for the first tasing and nonresistant for the second tasing. For the first tasing, given that there were no physical struggles or direct verbal threats, the plaintiff's refusal to exit his apartment constituted mere noncompliance and thus fell squarely within the definition of passive resistance. *Id.* at 323–24. For the second tasing, although the plaintiff did not present his hands for handcuffing, it was due to an obvious impediment known to the officers: he was convulsing due to the first, "atypically long" tasing, rendering him unable to present his hands. *Id.* at 324. As a result, the plaintiff had functionally "ceased all resistance." *Id.*

One more case, *LaPlante v. City of Battle Creek*, 30 F.4th 572 (6th Cir. 2022), drives home the mere noncompliance principle in the definition of passive resistance. There, officers stopped the plaintiff while performing patrol duties and ordered him out of his car. *Id.* at 574. Complying with that order, the plaintiff exited his vehicle with a beer in hand. *Id.* at 574–75. With a taser drawn, an officer directed the plaintiff to show him his hands and put down his beer. *Id.* at 575. The plaintiff did not set down the beer, so the officer knocked it from his hand. *Id.* The officer then ordered the plaintiff to place his hands behind his back. *Id.* The plaintiff did not do so immediately, but after follow-up commands, he complied. *Id.* After asking the officer a question, the plaintiff "raised his hands in the air above his head, with a ninety-degree bend at each of his elbows." *Id.* The officer again commanded the plaintiff to place his hands behind his back. *Id.* The plaintiff lowered his hands and bent his knees, at which point the officer grabbed the plaintiff and pulled him to the ground into a prone position. *Id.* at 576.

*Laplante* concluded that the plaintiff's conduct at most amounted to passive resistance. *Id.* at 579–81. In so doing, it observed that the plaintiff merely "failed to comply with a number of the officer's verbal orders to show his hands, put down his beer, and place his hands behind his back." *Id.* at 579. That is, before the officer took him down, the plaintiff was simply noncompliant. And *Laplante* emphasized two mitigating factors that further justified considering the plaintiff's conduct passive noncompliance: (1) even though the officer instructed the plaintiff to place his hands behind his back, *Laplante* highlighted that he "had not been told that he was being arrested"; (2) when he moved his hands in the air before handcuffing, it could have signified surrender, not defiance. *Id.* at 580–81.

While *Kent*, *Goodwin*, and *Laplante* are archetypal "mere noncompliance" passive resistance cases, several other Sixth Circuit cases mark the outer boundaries of passive resistance. Straight to the point, outer-boundary passive resistance cases involve some degree of physical movement during an arrest. To that end, they require courts to assess whether the movement signified a physical struggle or other volitional act of defiance—pushing the confrontation beyond passive resistance—or whether it signaled something less, rendering it passive resistance.

Take *Shumate v. City of Adrian*, 44 F.4th 427 (6th Cir. 2022), a case that involved physical movement when an officer engaged the plaintiff, but while the plaintiff was not knowingly being placed under arrest. The plaintiff in *Shumate*'s daughter called him when an officer pulled her over. *Id.* at 433–34. The plaintiff's arrival at the scene triggered a two-part series of the officer using force on the plaintiff.

To start the first period of force in *Shumate*, the officer—who had previous encounters with the plaintiff—instructed him to leave. *Id.* at 434. The plaintiff refused, responding instead with a stream of expletives. *Id.* at 434–35. As the officer faced him, he instructed the plaintiff to place his

- 14 -

hands behind his back and reached for them. *Id.* Before the officer could secure his hands, the plaintiff took "a few steps back, avoiding the officer's grasp." *Id.* The officer immediately deployed his taser in dart mode. *Id.* The plaintiff fell to the ground in pain, where the officer ran to him and seized one of his arms. *Id.* The plaintiff then rolled onto his back and drew his arms away, placing them in front of his face. *Id.*

That sequence led to the second episode of force in *Shumate.* After the initial tasing, the officer straddled the plaintiff and ordered him to roll back over and place his hands behind his back. *Id.* When the plaintiff expressed that he was not trying to resist but instead surrender, the officer tased him in dart mode a second time. *Id.* The officer then punched, kneed, and kicked the plaintiff several times, repeatedly commanding him to stop resisting despite the plaintiff's continued assertions that he was not attempting to resist. *Id.* At one point, as the plaintiff lay prone and rolled slightly onto his left side, the officer applied the taser in drive-stun mode. *Id.* The officer next grabbed the plaintiff by the collar and ordered him to turn over. *Id.* When the plaintiff rose onto his hands and knees, the officer shoved him, told him not to get up, and struck him repeatedly. *Id.* Although the officer ordered the plaintiff to lie down, the plaintiff did not do so because the officer continued to hold him by the collar. *Id.* at 437. Only after backup arrived did the officers handcuff the plaintiff and transport him to the hospital. *Id.*

In evaluating the first episode, *Shumate* concluded that the plaintiff, at most, passively resisted. *Id.* at 446–49. Before the initial tasing, the plaintiff's conduct consisted of verbal abuse, rudeness, and a refusal to comply—hallmarks of passive resistance. *Id.* at 447. His brief step backward when the officer attempted to grasp and handcuff him amounted to no more than noncompliance. *Id.* The same was true of the plaintiff's slight arm movements when he pulled his arms from the officer's hands and placed them in front of his face as he rolled onto his back

immediately after being tased. *Id.* Although those actions involved some physical movement, the court emphasized that, viewed in context—and particularly given that the plaintiff was not knowingly under arrest—they did not reflect a defiant physical struggle. *See id.* at 447–48.

Likewise, *Shumate* held that during the second period of force, the plaintiff passively resisted. *Id.* at 448–49. True, the court acknowledged, the plaintiff did not "readily offer his hands for handcuffing," which, when coupled with other indicia of defiance, can constitute active, rather than passive resistance. *Id.* But the court explained that his repeated verbal statements disclaiming resistance and his prone posture *before* the additional tasings and body strikes reflected, at most, passive noncompliance accompanying an effort to surrender, not defy. *Id.* The court further underscored that for most of this period, the plaintiff still was not knowingly under arrest, as the officer had not yet informed him that he was. *Id.* at 449. As a result, "no reasonable officer would believe" that the plaintiff was actively, as opposed to passively, resisting. *Id.*

Consider next another passive resistance case at the outer boundaries, *Saalim v. Walmart, Inc.*, 97 F.4th 995 (6th 2024). There, the plaintiff dropped off two people at Walmart and waited for them in a no-parking zone. *Id.* at 999. While working as a private security guard for Walmart, wearing his full sheriff's uniform, an officer approached the plaintiff and asked for his driver's license. *Id.* The plaintiff did not provide it and asked the officer why he needed it. *Id.* After some discussion and the officer's continued requests for identification, the plaintiff acquiesced but again questioned the need to produce the license. *Id.* Without warning, the officer opened the car door, grabbed the plaintiff's arm, and tried to force him out. *Id.* The plaintiff asked what he had done wrong and requested that the officer stop. *Id.* At that point, the officer drew his taser and demanded that the plaintiff get out of the car. *Id.* The plaintiff did not comply, so the officer warned the plaintiff that he would tase him. *Id.* That time, the plaintiff complied, exiting the car. *Id.*

- 16 -

When the plaintiff exited, the officer shoved him into the side of the car. *Id.* at 1000. The plaintiff then asked what he had done wrong, and the officer directed the plaintiff to stop resisting and pushed his taser into the plaintiff's stomach. *Id.* At some point, the plaintiff placed his hands on top of his car, and the officer pulled out his handcuffs. *Id.* With his hands visibly empty and in "a non-threatening pose," the plaintiff turned to face the officer at that time. *Id.* After that, the officer tased the plaintiff and ordered the plaintiff to stop resisting, who responded that he was not resisting. *Id.* The officer tased the plaintiff again, placed him in handcuffs, and "forced him to the ground, causing" the plaintiff "to cry out in pain." *Id.*

*Saalim* concluded that the plaintiff's failure to initially exit the car and turning around when the officer removed his handcuffs constituted passive resistance. *Id.* at 1005–09. In short order, *Saalim* held that the plaintiff's not immediately exiting his car when the officer grabbed him did not constitute active resistance, especially when the officer did not order him out. *Id.* at 1006. As for the plaintiff turning around, although it meant he did not readily present his hands for handcuffing, the court held that this slight, non-threatening movement was passive. *Id.* at 1006–08. Two facts bolstered this holding: (1) again, the officer did not inform the plaintiff that he was under arrest, so the modest physical movement did not directly suggest defiance; and (2) the plaintiff's failure to present his hands for handcuffing by turning around was not coupled with "other indicia of resistance," like, say, "jerk[ing] his hands away" or hiding them to avoid handcuffing. *Id.* at 1007–08.

A final boundary case, *King v. City of Rockford*, 97 F.4th 379 (6th Cir. 2024), further elucidates the principle that slight physical movement when facing arrest, without more, can constitute passive resistance. In *King*, an officer stopped the plaintiff for traffic violations while the plaintiff was pulling into his driveway. *Id.* at 388. Without waiting for a command to do so, the

plaintiff exited his car once he parked in his driveway. *Id.* at 388–89. The plaintiff then complied with the officer's command to show his hands. *Id.* at 389. After the plaintiff refused a chemical test for marijuana use, he and the officer began arguing. *Id.* The officer grabbed the plaintiff's arm for handcuffing, but the plaintiff stepped away and turned toward his house to call his fiancée. *Id.* At that point, the officer ordered the plaintiff to step to the rear of his car and put his hands behind his back. *Id.* The plaintiff complied. *Id.* But the plaintiff again turned to call out to his fiancée, at which point the officer grabbed his coat and threw him to the pavement. *Id.*

*King* found that a reasonable jury could conclude that the plaintiff was passively resisting. *Id.* at 396. *King* noted that the plaintiff was argumentative and partially noncompliant. *Id.* And *King* acknowledged that the plaintiff turned his body away from the officers to call to his fiancée, which temporarily frustrated the officer's efforts to grasp and control him. *Id.* at 397. But the court concluded that the plaintiff was generally compliant and that, in context, turning his body did not reflect physical hostility or defiance. *Id.*

With that passive resistance case law in mind, the amount of force constitutionally acceptable when one passively resists arrest is uncomplicated. When someone passively resists, officers may use minimal force to carry out an arrest, so long as the force is not "gratuitous." *See Chaney-Snell*, 98 F.4th at 715 (collecting cases); *Gambrel v. Knox Cnty.*, 25 F.4th 391, 402 (6th Cir. 2022). For example, officers may grab a person's arms to effectuate an arrest, control an uncertain situation, ensure compliance, or escort an arrestee to their patrol vehicles. *See Smith v. City of Wyoming*, 821 F.3d 697, 718 (6th Cir. 2016); *Phelps v. City of Saginaw,* No. 1:23-CV-11020, 2025 WL 3157712, at *12 (E.D. Mich. Nov. 12, 2025) (collecting cases). But they *may not* use intermediate force, such as tasers or takedowns, when someone passively resists. *See, e.g., Goodwin*, 781 F.3d at 323–28 (taser); *Solomon v. Auburn Hills Police Dep't,* 389 F.3d 167, 174

(6th Cir. 2004) (leg-sweep takedowns). So the tasings in *Goodwin*, *Kent*, *Shumate*, and *Saalim*, the repeated body strikes in *Shumate*, and the takedowns in *King* and *Laplante* were all objectively unreasonable.

Now consider what constitutes active resistance. By contrast to passive resistance, one actively resists arrest "by physically struggling with police, threatening them, . . . or acting erratically." *Moore*, 126 F.4th at 1168. Active resistance also includes resisting handcuffs. *Id.*; *see also King*, 97 F.4th at 396. Such resistance includes locking up one's body to avoid being handcuffed, *see Rudlaff*, 791 F.3d at 642, or otherwise physically resisting handcuffs, by, say, jerking one's arms away from an officer's grasp, *Bell v. City of Southfield*, 37 F.4th 362, 368 (6th Cir. 2022). It also includes "an arrestee refusing to move his hands for the police to handcuff him, at least" when coupled with other indicia of defiance. *Feagin*, 155 F.4th at 604 (citing *Rudlaff*, 791 F.3d at 641); *see also Hagans v. Franklin County Sheriff's Office*, 695 F.3d 505, 509; *Caie v. W. Bloomfield Twp.*, 485 F. App'x 92, 94, 96–97 (6th Cir. 2012); *Bozung v. Rawson*, 439 F. App'x 513, 520–21 (6th Cir. 2011). Like passive resistance, Sixth Circuit case law illuminates what conduct establishes active resistance.

Take *Feagin v. Mansfield Police Department*, 155 F.4th 595 (6th Cir. 2025). There, officers patrolling a residential street narrowly avoided a collision with the suspect, who drove recklessly in the opposite direction. *Id.* at 601. The officers pursued the suspect and stopped him. *Id.* at 602. When one officer approached the vehicle, the suspect rolled up his window and reached toward the center console. *Id.* The officer ordered the suspect to exit the car three times, but the suspect refused. *Id.* As the officer tried to open the door, the car began to roll backward, prompting the officer to strike the window, which in turn prompted the plaintiff to park the car. *Id.* The officer opened the door and attempted to remove the suspect by grasping his arm, but the suspect stiffened

and leaned back into the seat. *Id.* The other officer approached, and the two officers removed the suspect from his car, at which point ammunition fell from his pockets. *Id.* Immediately after, one officer tased the suspect and arrested him. *Id.*

On those facts, *Feagin* held that the suspect actively resisted arrest. *Feagin* determined that the suspect's actions leading up to the officers' tasing him were not passive: while undetained, he defied commands, rolled up his window, stiffened his body, and attempted to reposition himself inside the vehicle when the officers tried to remove him. *Id.* at 606. Thus, the court concluded that a reasonable officer could interpret this noncompliance and physical resistance as avoiding arrest. *Id.* at 606.

Or take *Rudlaff v. Gillispie*, 791 F.3d 638 (6th Cir. 2015). There, an officer lawfully stopped a suspect for driving with a suspended license. *Id.* at 640. The officer informed the suspect that he was under arrest, opened the car door, and directed him to exit the vehicle. *Id.* As the suspect exited the vehicle, he puffed out his chest and appeared agitated. *Id.* The officer ordered the suspect to place his hands on the vehicle. *Id.* But he did not comply. *Id.* In response, the officer grabbed the suspect's arm and tried to place it on the vehicle. *Id.* The suspect then jerked his arm down to prevent the officer from handcuffing him. *Id.* The officer then attempted to handcuff the suspect, who jerked his arm down again. *Id.* When the officer ordered the suspect to give him his hands, he did not and instead locked up his body. *Id.* So the officer delivered a knee strike, which was ineffective. *Id.* When the suspect still did not present his hands, another officer who arrived as backup warned the suspect to relax his body or the officer would tase him. *Id.* Moments later, the officer tased the suspect, which subdued him. *Id.*

*Rudlaff* determined that "[n]o matter how you cut it, [the suspect] actively resisted arrest." *Id.* at 642. In so determining, *Rudlaff* emphasized several facts. *Id.* At the outset of the encounter,

when the officer informed the suspect that he was under arrest, the suspect was verbally defiant, agitated, and puffed out his chest. *Id.* And before the officers used a knee strike and taser, the suspect had jerked his arm away from an officer and locked up his body, refusing to give the officers his hands. *Id.*

Now consider *Bell v. City of Southfield*, 37 F.4th 362 (6th Cir. 2022), which is similar to *Rudlaff*. In *Bell*, an officer pulled over the suspect and asked him for his identification. *Id.* at 365. For three minutes, the suspect went "back and forth" with the officer and declined to provide his identification over twenty times, opting instead to question what he had done wrong. *Id.* The officer then reached into the window to unlock the car door as he continued to request the suspect's identification. *Id.* Two other officers arrived as backup, and the officers pried open the door and told the suspect to get on the ground. *Id.* But the suspect "repeatedly refused." *Id.* The officers wrestled him to the ground. *Id.* With one officer pinning down the top portion of the suspect's body, another tried to grab his arm for handcuffing. *Id.* Yet the suspect pulled it away. *Id.* Another officer commanded the suspect to put his hands behind his back. *Id.* When the suspect did not do so, an officer tased him. *Id. Bell* found active resistance on those facts. *Id.* at 368.

Finally, *Caie v. W. Bloomfield Twp.*, 485 F. App'x 92 (6th Cir. 2012), provides more helpful gloss in handcuffing scenarios. In that case, officers responded to a welfare check on a suicidal and intoxicated person who was standing in a lake. *Id.* at 93–94. When commanded to come to the shore, the person did not and suggested that he should fight the officers to get them to shoot him. *Id.* at 94. But he ultimately complied, walking ashore and sitting down. *Id.* Yet he continued to make comments about fighting the officers to prompt them to shoot him and exhibited mood swings. *Id.* The officer attempted to get the person to voluntarily go to the hospital, but he would not and eventually ran from the officers. *Id.* The officers wrestled him to the ground. *Id.* at 96.

They then repeatedly ordered the individual, whose hands were under his body, to place his hands behind his back. *Id.* He did not, so an officer tased him once in drive-stun mode, which secured compliance. *Id. Caie* concluded that even though he was "arguably subdued," under the circumstances—where he had exhibited other indicia of defiance beforehand—the individual failing to place his hands behind his back constituted active resistance. *Id.* at 97.

When someone actively resists, officers may use substantial force—like takedowns and tasers—to subdue and arrest the person. *See, e.g.*, *Feagin*, 155 F.4th at 604; *Bozung*, 439 F. App'x at 520–21 (takedown permitted when plaintiff actively resisted by failing to place his hands behind his back after repeated commands and ample time to do so); *Williams v. Sandel*, 433 F. App'x 353 (6th Cir. 2011) (pepper spray, baton strikes, and 37 rounds of tasing permitted to subdue actively resistant suspect who was high on illicit substances). Thus, the tasings in *Feagin*, *Rudlaff*, *Bell*, and *Caie* were permissible. Still, an officer must reduce the amount of force used to no force or to minimal, non-gratuitous force once a suspect is detained or has ceased resisting. *See Gambrel*, 25 F.4th at 402; *see also Rudlaff*, 791 F.3d at 642 ("A simple dichotomy thus emerges: When a suspect actively resists arrest, the police can use a taser (or a knee strike) to subdue him; but when a suspect does not resist, or has stopped resisting, they cannot.").

Against that legal backdrop—with the dichotomy between passive and active resistance firmly in mind—turn, now, to whether Plaintiff actively resisted when Defendant Grubbs (1) conducted a takedown maneuver, or (2) tased Plaintiff for ten seconds in drive stun mode. Considering the circumstances from the perspective of a reasonable officer on the scene, Plaintiff was actively resisting arrest during both uses of force. So Defendant Grubbs's force was objectively reasonable.

- 22 -

*Takedown Maneuver.* Up front, Defendant Grubbs's leg-sweep takedown maneuver was objectively reasonable.

The body-camera footage leaves no doubt that Plaintiff was actively resisting arrest when Defendant Grubbs took him to the ground. Most importantly, after Defendant Grubbs announced the arrest and seized Plaintiff's arms to apply handcuffs, Plaintiff responded with physical resistance: tensing and flexing his arms and jerking them up and away. *See* ECF Nos. 45-6 at 2:17–19; 45-2 at 3:00–02; 45-5 at 2:59–3:01. In other words, once Plaintiff knew that Defendant Grubbs was arresting him, he physically resisted. That physical defiance resembles the exact conduct deemed active resistance in *Rudlaff*, *Bell*, and *Feagin*.

The moments leading up to the takedown bolster that conclusion. Before Defendant Grubbs reached for Plaintiff's arms, Plaintiff had already refused repeated orders to leave the crash site and return to his vehicle, all while remaining argumentative and agitated. See ECF No. 45-2 at 0:00–2:45. And immediately before the attempted arrest, Plaintiff advanced toward Defendant Grubbs and shouted at him "while clearly agitated." ECF No. 50 at PageID.658; ECF No. 45-2 at 2:57–3:00. Considering that context, Plaintiff's decision to lock his arms and wrench them away cannot plausibly be cast as passive behavior. It was "a deliberate act of defiance," *Goodwin*, 781 F.3d at 323—active resistance, plain and simple. Because Plaintiff actively resisted, Defendant Grubbs's intermediate use of force in taking down Plaintiff to effect the arrest was objectively reasonable.

Plaintiff's argument to the contrary does not alter the analysis. He contends that he had "no meaningful chance to comply" with the arrest. *See* ECF No. 50 at PageID.670–71. To be sure, in cases involving no physical resistance, only a failure to respond immediately to commands, the opportunity to comply may bear on whether the conduct amounts to passive noncompliance or

- 23 -

deliberate defiance. *See Laplante*, 30 F.4th at 579–80; *cf. Bozung*, 439 F. App'x at 520–21. But this case is qualitatively different: Plaintiff did not merely hesitate, stand still, or exhibit some other sort of inaction when ordered to place his hands behind his back, as the plaintiff did in those types of cases. Rather, he physically resisted Defendant Grubbs's grasp when he had been told that he was under arrest, and Defendant Grubbs sought to handcuff him. And in any event, if Plaintiff had time to tense, lock, and yank his arms away, he also had time to permit Defendant Grubbs to place those arms behind his back.

***Drive-Stun Tasing.*** Defendant Grubbs's tasing Plaintiff for ten seconds (two, five-second rounds) in drive-stun mode was also objectively reasonable.

As with the takedown, the video evidence shows that Plaintiff actively resisted arrest before Defendant Grubbs used the taser. Once on the ground, Plaintiff continued to struggle with the Troopers by, for example, pulling his legs away as they tried to restrain them. *E.g.*, ECF Nos. 45-2 at 3:04–09; 45-4 at 2:53–57; 45-7 at 2:23–26; *accord* ECF No. 50-9 at PageID.873. He also clenched his fists and tucked his hands at his waistband. *See* ECF Nos. 50-9 at PageID.873–75; 45-11 at PageID.513–14, 574; 45-5 at 3:36–39; 45-2 at 3:35–39. And throughout the moments leading up to the tasings, he ignored repeated commands to place his hands behind his back. *See, e.g.*, ECF No. 45-5 at 3:09–30.

Here, then, this is not a case in which the plaintiff merely failed to immediately present his hands for handcuffing—or made slight movements—without other indicia of defiance and without notice that he was under arrest, as in *Shumate* or *Saalim*. Instead, Plaintiff's refusal followed clear notice of arrest and coincided with additional, overt acts of defiance: overlapping and sustained physical struggles that reflect active resistance, as in *Caie*, *Bell*, *Feagin*, and *Rudlaff*, justifying the use of a taser.

- 24 -

Plaintiff's counterpoints do not change the calculus. Notably, Plaintiff does not contend that he placed his hands behind his back when ordered to do so during and after his physical struggle with the officers. *See generally* ECF No. 50. Rather, he argues that he could not comply because of an injured shoulder, rendering Defendant Grubbs's use of the taser unreasonable. *Id.* at PageID.671–72.

But that argument misapprehends the governing inquiry. Objective reasonableness turns only on "the facts that were knowable to the defendant officers" at the time force was used. *Reich v. City of Elizabethtown*, 945 F.3d 968, 979 (6th Cir. 2019) (citation modified). Yet body-camera footage shows that no one informed the officers of Plaintiff's shoulder injury before the tasings, and Plaintiff did not state that he was not resisting until after Defendant Grubbs deployed the taser. ECF Nos. 45-5 at 3:36–39; 45-2 at 3:35–55. And Defendant Grubbs did not tase Plaintiff after that information was conveyed. *See id.* So because Plaintiff's injury was not knowable to Defendant Grubbs before the tasings, it "bear[s] no weight in the reasonableness calculus." *Wright*, 962 F.3d at 868 (concluding that the plaintiff's preexisting medical issue is irrelevant "if the officers did not know of" it before using force); *cf. Smith v. City of Troy*, 874 F.3d 938, 945 (6th Cir. 2017) (considering medical issue when the plaintiff notified the officer before the officer used force).

Even so, attempting to create a fact issue on this front, Plaintiff points to three pieces of testimony in the record. First, he cites testimony from his expert witness, who stated that "as [Plaintiff] was on the ground, and it was explained that he wasn't resisting but couldn't move his arms behind his back, [Defendant] Grubbs used the taser to dry stun" Plaintiff. ECF No. 50-8 at PageID.852. Second, he cites Ms. Anaya's deposition testimony, who stated that she, Plaintiff's wife, and Plaintiff told the officers before the tasings that Plaintiff was not resisting and could not put his arms behind his back because of a bad shoulder, yet Defendant Grubbs tased him "three

times or four" without stopping. ECF No. 50-4 at PageID.737. Third, Plaintiff cites Defendant Grubbs's testimony acknowledging that Plaintiff mentioned his shoulder, prompting the use of two sets of handcuffs. ECF No. 50-5 at PageID.782.

But this testimony does not help Plaintiff. The body-camera footage clearly contradicts the expert's and Ms. Anaya's suggestions that officers were notified of a shoulder injury before the tasings, and such testimony cannot override clear video evidence. *DeVooght*, 157 F.4th at 899–900. Ms. Anaya's claim that Defendant Grubbs tased Plaintiff "three times or four" fares no better: both the video and the taser download report show that Defendant Grubbs deployed the taser twice, in drive-stun mode, for five seconds each time—and did not tase Plaintiff after learning of any shoulder injury. *See* ECF No. 45-12 at PageID.628. Nor does Defendant Grubbs's testimony change the analysis. Read in context, he explained only that the officers used two sets of handcuffs, well after the tasings, once Plaintiff informed them of his shoulder injury. *See* ECF No. 50-5 at PageID.782.

In sum, Defendant Grubbs used objectively reasonable force when he (1) leg-swept Plaintiff, and (2) tased Plaintiff twice in drive-stun mode. To that end, Plaintiff was actively resisting arrest during both instances of force. Thus, Plaintiff cannot establish a Fourth Amendment excessive-force claim against Defendant Grubbs.

### b. Clearly Established Analysis

Even if Defendant Grubbs used unreasonable force, it was not clearly established on December 4, 2023, so he is entitled to qualified immunity. A right is clearly established when it is "sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (cleaned up). This standard "protects 'all but the plainly incompetent or those who knowingly violate the law.'" *District of Columbia v.*

*Wesby*, 583 U.S. 48, 63 (2018). And plaintiffs bear "the burden of showing that the right was clearly established." *Bell*, 37 F.4th at 367.

To meet their burden, plaintiffs must show that existing law places the "official's conduct 'beyond debate' such that any reasonable official would understand that [his] conduct was unlawful." *Finley*, 102 F.4th at 808 (cleaned up). Generally, this means plaintiffs must provide an "on-point" Sixth Circuit or Supreme Court "case showing that reasonable officers would have known their actions were unconstitutional under the *specific* circumstances they encountered." *Bell*, 37 F.4th at 367–68 (emphasis added); *see also Chaney-Snell*, 98 F.4th at 720. And because unpublished cases are nonbinding, "a plaintiff cannot point to unpublished decisions to meet his burden" of showing that a right is clearly established. *Bell*, 37 F.4th at 367. Here, Plaintiff has not met his burden on either challenged use of force.

As for the takedown cases, in his brief, Plaintiff cites only *King v. City of Rockford*, 97 F.4th 379 (6th Cir. 2024), *Meadows v. City of Walker*, 46 F.4th 416 (6th Cir. 2022), and *LaPlante v. City of Battle Creek*, 30 F.4th 572 (6th Cir. 2022). ECF No. 50 at PageID.663, 673. But all three cases are inapposite. They all involved generally compliant, or at most passively resistant, plaintiffs who did not physically *defy* the officers' attempts to arrest them before being taken down.

And Plaintiff's cited taser cases, *Goodwin*, *Shumate*, and *Landis v. Baker*, 297 F. App'x 453 (6th Cir. 2008), feature the same fatal flaw. These cases all involved passively resistant or non-resistant plaintiffs. Not to mention, *Landis* is unpublished, so it cannot, by itself, clearly establish a right. *Bell*, 37 F.4th at 367.

Stretching the Sixth Circuit cases as far as they can go in Plaintiff's favor, at best, this case is a "twilight zone" case. *Feagin*, 155 F.4th at 604. Twilight zone cases involve "suspects who are

- 27 -

neither wholly submissive yet neither threatening another nor engaging in active resistance." *Id.* For these cases, which "operat[e] in the hazy border between excessive and acceptable force, the proper course is to grant summary judgment to the officer[] on qualified immunity grounds." *Id.* (citation modified). Because Plaintiff was not "wholly submissive," no matter how you assess the facts, Defendant Grubbs is entitled to "the benefit of the doubt," and thus qualified immunity shields him from liability. *Id.*

### 2. Defendant Henderson

Finally, turn to Plaintiff's Fourth Amendment excessive-force claim. Plaintiff presses that claim against Defendant Henderson based on the same two uses of force he attributes to Defendant Grubbs: the leg-sweep takedown and the subsequent drive-stun tasings. *See* ECF No. 1 at PageID.4–5. The difficulty for Plaintiff on this argument is also clear. Defendant Grubbs—not Defendant Henderson—carried out those uses of force. Thus, Plaintiff's Fourth Amendment excessive-force claim against Defendant Henderson lacks merit: Plaintiff cannot point to Defendant Grubbs's use of force to establish a § 1983 claim against Defendant Henderson. *See Pineda v. Hamilton Cnty.*, 977 F.3d 483, 490 (6th Cir. 2020) ("Each defendant must be personally involved in the unconstitutional action. . . . Proximity to a wrongdoer does not authorize punishment." (citation modified)).

Nor does Plaintiff identify any clearly established law holding that an officer's mere proximity to another officer's use of force, without more, violates the Fourth Amendment. Absent such authority, Defendant Henderson is entitled to qualified immunity.

\*\*\*

In short, Plaintiff has not established a claim against either Defendant. He has not shown that Defendant Grubbs or Defendant Henderson violated his Fourth Amendment rights. Even if he

did, the violation was not clearly established as of December 4, 2023, so Defendants are entitled

to qualified immunity. Accordingly, Defendants' Motion for Summary Judgment, ECF No. 45, will

be granted, and Plaintiff's Complaint, ECF No. 1, will be dismissed with prejudice.

**IV.**

Accordingly, it is **ORDERED** that Defendants' Motion for Summary Judgment, ECF No.

45, is **GRANTED**.

Further, it is **ORDERED** that Plaintiff Robert Bigger's Complaint, ECF No. 1, is

**DISMISSED WITH PREJUDICE**.

**This is a final order and closes this case.**

Dated: February 20, 2026                              s/Thomas L. Ludington
                                                      THOMAS L. LUDINGTON
                                                      United States District Judge